Robert Penchina 
Laura M. Leitner
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
321 West 44th Street, Suite 510
New York, New York 10036
(212) 850-6100

'09 CIV 10378

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

SOCCER UNITED MARKETING, LLC and
MAJOR LEAGUE SOCCER, L.L.C.,

                    Plaintiffs,

      -against-

THE BLACK & DECKER CORPORATION, d/b/a
DEWALT INDUSTRIAL TOOL CO.,

                    Defendant.

------------------------------------------------------------x

RECEIVED
DEC 2 2 2009
U.S.D.C. S.D.N.Y.

Civil Action No.:

Judge:

**JURY DEMANDED**

## COMPLAINT

Plaintiffs Soccer United Marketing, LLC ("SUM") and Major League Soccer, L.L.C.

("MLS"; SUM and MLS are referred to collectively as "Plaintiffs"), by their undersigned

attorneys, bring this action against Defendant the Black & Decker Corporation, d/b/a DeWalt

Industrial Tool Co. ("Defendant" or "B&D") and complain and allege as follows:

### JURISDICTION AND VENUE

1.     Pursuant to 15 U.S.C. §1121(a), this Court has original subject matter jurisdiction

over this action as it arises under U.S.C. Title 15, Chapter 22 (the "Lanham Act"), and involves

Defendant's infringement and dilution of federally registered trademarks owned or controlled by

Plaintiffs, and Defendant's acts of unfair competition, false advertising and false designation of origin. Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over all other claims not asserted under the Lanham Act, as these claims are related to claims within the Court's original jurisdiction.

2.    This Court has personal jurisdiction over Defendant by virtue of its transacting, doing, and soliciting business in this district and pursuant to N.Y. Civ. Prac. L. & R. 302(a), and because Defendant continues to engage in tortious acts causing injury to Plaintiffs and Plaintiffs' property in this district.

3.    Venue is proper in this district under 28 U.S.C. §1391(b).

## THE PARTIES

4.    SUM is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 420 Fifth Avenue, 7th Floor, New York, New York 10018. SUM is in the business of staging and promoting soccer matches in the United States. SUM is the preeminent company in its field and it holds the exclusive rights to the most important soccer properties in the nation, including all commercial rights to Major League Soccer, the U.S. Soccer Federation which includes the USA Men's and Women's National Teams, commercial rights and match promotion rights in the United States to the Mexican Men's National Team and prestigious international teams as the Mexican premier league professional team Club Deportivo Guadalajara S.A. de C.V., better known by its trademarked name CHIVAS, and FCBarcelona, the most popular European soccer team. SUM also holds the exclusive commercial rights and match promotion rights to prestigious tournaments including the bi-annual Gold Cup soccer tournament staged in the United States by the Confederation of North, Central American and Caribbean Association Football

("CONCACAF"), InterLiga, a tournament among top Mexican clubs to determine Mexican participants in the prestigious Copa Libertadores and  SuperLiga a tournament between MLS clubs and Mexican premier league clubs.  SUM also hold the commercial rights to the CONCACAF Champions League, a tournament between the top clubs within the CONCACAF region, and the Women's Professional Soccer ("WPS") league.

5.     MLS is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 420 Fifth Avenue, New York, New York 10018.  MLS owns and operates the premier professional soccer league in the United States. MLS currently has fifteen teams located throughout the United States, plus one in Canada, and has plans to expand to sixteen teams in 2010 and eighteen teams by 2011.  MLS owns and licenses intellectual property rights, including trademarks, associated with the MLS league and teams.

6.     Upon information and belief, Defendant is a corporation organized and existing under the laws of the State of Maryland with its principal place of business at 701 E. Joppa Road, Townson, Maryland 21286 and is registered with the New York Department of State as a foreign corporation authorized to do business in New York.  Upon further information and belief, Defendant is the owner of the trademark DEWALT for use in connection with tools, and does business in New York and elsewhere under the designations "DeWalt Industrial Tool Company," "DeWalt Professional Tool Company" and "DeWalt."

## BACKGROUND

7.     SUM is the exclusive agent within the United States for all rights in and to the copyrights, names, trademarks, trade dress and indicia of origin of MLS, including the names, logos and marks of the individual teams competing in MLS such as D.C. United, the Mexican

National Football [soccer] Team, the CONCACAF Gold Cup Tournament, and Club Deportivo Guadalajara S.A. de C.V.("Chivas"), among other soccer properties.

8.    Since at least as early as 1996, MLS has offered "entertainment services in the nature of soccer" and has sold and licensed numerous types of goods and services under the mark MLS.

9.    MLS soccer matches are widely known and promoted under the MLS name and marks throughout the United States.  MLS matches are televised to millions of fans by a number of television networks in the United States, including ESPN, espn2, FOX Soccer Channel, Fox Sports en Español, and Univision.   In addition, the league's games and other news about the league are covered on countless news programs, and by countless newspapers, magazines, web sites and other media.  MLS has become widely known in the marketplace as the preeminent source for goods and services relating to professional soccer in the United States.  More than three million fans attended MLS games during each season since 2007.

10.    MLS owns, inter alia, the following federal trademark registrations: Registration No. 2,057,686 for MLS; Registration No. 2,039,199 for MLS & Design; Registration No. 2,039,200 for MLS & Design; Registration No. 2,143,103 for D.C. UNITED; Registration No. 2,401,299 for D.C. UNITED & Design; and 3,471,036 for D.C. UNITED & Design.

11.    MLS's goods and services are strongly associated with and identified by MLS's marks, which have been continuously owned and used by MLS and SUM in commerce since at least as early as 1996.

12.    Since 1996, MLS's marks and reputation have continuously grown and are well known throughout the United States and the world as a source of origin in MLS for professional soccer related goods and services.

13.     Over the years, MLS has spent a considerable amount of money and exercised great effort in advertising its marks and establishing its marks in the minds of consumers as identifiers of MLS's high quality goods and services.

14.     MLS's marks have also been affixed to and used in commerce in connection with a wide variety of promotional and sales items, such as posters, signs, display units, uniforms, and promotional materials.

15.     MLS, in conjunction with SUM, has licensed its marks for the exclusive use of official licensees in various categories of goods and services.  For example, adidas is MLS's exclusive licensee in the category of apparel, Pepsi is MLS's exclusive licensee in the category of soft drinks, and Makita is MLS's exclusive licensee in the category of power tools.  MLS's official licensees have the exclusive right to promote an affiliation between themselves and their own goods and services, on the one hand, and MLS and its goods and services on the other.

16.     By virtue of the extensive use of its marks and the substantial sums MLS has spent to promote the marks, MLS's marks have acquired such goodwill that the public has come to associate these marks exclusively with MLS and to believe that the marks uniquely identify MLS's goods and services, including soccer matches involving MLS teams.

17.     The Mexican National Football Team has, over the past two decades, consistently been among the higher rated national teams in the world.  Fans and soccer aficionados the world over refer to the Mexican National Team as El Tricolor, a reference to the three colors comprising the Mexican flag, which colors are replicated in the team's uniform, the primary and most recognizable color being green, and embodied in a logo adorning the front of the uniform.

18.     The Mexican National Team is extremely popular in parts of the United States, particularly among the Mexican American and Hispanic American communities.  On average,

the games featuring the Mexican National Team played in the United States have drawn attendance of more than 30,000 people, with millions following the match on television, radio, and the Internet.

19.    Like other popular sports teams, the Mexican National Team has entered into official licensing and affiliation relationships with sponsors in various categories.  Working with SUM, the Mexican National Team has entered into exclusive sponsorships for its marks and games in the United States with a number of companies.  For example, Budweiser is the official beer sponsor of the Mexican National Team, Allstate is the official insurance sponsor of the Mexican National Team, AT&T is the official phone service sponsor of the Mexican National Team and Makita is the official power tool sponsor of the Mexican National Team.

20.    The CONCACAF Gold Cup is a major international soccer tournament held every other year for the men's national teams from countries in the regions where soccer is administered by CONCACAF (North and Central America and the Caribbean).  Since 1991, the tournament has been hosted in the United States.

21.    The CONCACAF Gold Cup tournament is popular with soccer fans in the United States.  It is particularly popular in communities populated by immigrants from the countries that compete in the tournament, including from Mexico and countries in Central America and the Caribbean.  Because Mexico has won the CONCACAF Gold Cup 8 times, far more than any other country, the event is particularly popular in Mexican American communities.  On average, matches in the Gold Cup tournament have drawn attendance of  more than 35,000 people, with many more following the match on television, radio, and the Internet.

22.    Like the organizers of other popular sporting events, CONCACAF has entered into official licensing and affiliation relationships for the Gold Cup tournament with event

sponsors in various categories.  Working with SUM, CONCACAF has entered into exclusive sponsorships with a number of companies.  For example, Miller is the Gold Cup's exclusive sponsor in the category of beer., State Farm is the Gold Cup's exclusive sponsor in the category of insurance and Sprint is the Gold Cup's exclusive sponsor in the category of telecommunications/wireless.

23.    Club Deportivo Guadalajara ("Chivas") is one of the most popular sports team in Mexico.  Chivas has won the championship of the top Mexican soccer league (the Primera Division de Mexico) eleven times, more than any other team.  On average, the games featuring Chivas played in the United States have drawn an attendance of more than 15,000 people per match.

24.    Like other popular sports teams, Chivas has entered into official licensing and affiliation relationships with sponsors in various categories.  Working with SUM, Chivas has entered into exclusive sponsorships for its games in the United States with a number of companies. For example, Budweiser is the official beer sponsor of Chivas, Boost Mobile is the official cell phone sponsor of Chivas and Jose Cuervo is the official liquor sponsor of Chivas.

25.    The United States Men's and Women's National Soccer Teams have, over the past two decades, consistently been among the higher rated national teams in the world.  The United States Men's National Team has qualified for the last five World Cups and most recently finished second in the prestigious 2009 Confederations Cup.  The United States Women's National Team is the defending Olympic champion and earned a bronze medal at the last Women's World Cup in 2007.

26.    Both the United States Men's and Women's National Teams are extremely popular.  On average, the games featuring the United States Men's National Team played in the

United States have drawn attendance of more than 20,000 people, the games featuring the United States Women's National Team played in the United States have drawn attendance of more than 6,000 people, with millions following both team's matches on television, radio, and the Internet.

27.     Like other popular sports teams, the United States Soccer Federation has entered into official licensing and affiliation relationships with sponsors in various categories.  Working with SUM, the United States Soccer Federation has entered into exclusive sponsorships for its marks with a number of companies.  For example, McDonald's is the official fast food sponsor of the United States National Teams, Visa is the official payment services sponsor of the United States National Teams, Dodge is the official automobile sponsor of the United States National Teams and Gatorade is the official isotonic beverage sponsor of the United States National Teams.

28.     SUM is an affiliate of MLS and, pursuant to an agreement with MLS, exclusively owns all commercial rights to the MLS's properties.  In addition, pursuant to agreements with Federacion Mexicana de Futbol Asociacion, A.C. ("FMF"), the association that controls the Mexican National Team, SUM holds the exclusive commercial, promotional and marketing rights for the Mexican National Team and games played in the United States by the Mexican National Team (excluding international tournaments held in the United States); pursuant to agreements with CONCACAF, SUM holds the exclusive commercial rights to CONCACAF (including the Gold Cup and Champions League tournaments) as well as additional promotional and marketing rights to the Gold Cup; pursuant to agreements with Club Deportivo de Guadalajara S.A. de C.V. and Chivas de Corazon S.A. de C.V., the entities that own and operate Chivas, SUM holds the exclusive commercial rights for Chivas and promotional and marketing rights for games played in the United States by Chivas; pursuant to agreements with the United

States Soccer Federation ("USSF"), SUM holds the exclusive commercial rights to the United States National Team games played.

29.      Pursuant to a license agreement by and between SUM and Makita, Makita is the official power tool sponsor for MLS, and SUM granted Makita the exclusive right to promote itself at and in conjunction with MLS and to communicate to the consuming public an association by and between MLS (and its services) and Makita (and its goods). Similarly, pursuant to agreements by and between SUM and Makita, Makita is the official power tool sponsor for the Mexican National Team in the United States. Previously, pursuant to agreement by and between SUM and Makita, Makita was also the official power tool sponsor for the Gold Cup Tournament in 2007.

30.      Defendant is engaged in the business of distributing power tools, hardware, accessories and other products. Defendant distributes power tools under the name DeWalt.

## DEFENDANT'S UNLAWFUL CONDUCT

31.      Defendant is, and at all times relevant to the matters alleged in the Complaint was, engaged in a pattern and practice of "ambush marketing" and knowingly, intentionally and willfully infringing Plaintiffs' trademarks, competing unfairly with Plaintiffs and their licensees, engaging in deceptive trade practices, confusing consumers, committing fraud, breaching contracts and interfering with the business of Plaintiffs. Defendant is engaged in a practice of deceptive advertising intended to confuse consumers into believing that B&D's DeWalt brand is associated with MLS, its teams and games, as well as the Mexican National Team and its games played in the U.S., and Chivas and its games played in the U.S. as well as the Gold Cup tournament. Defendant is reaping for itself the goodwill and reputation painstakingly built by

MLS and SUM, particularly among the Mexican American community, at great effort and expense over many years.

32.    Marketing to Hispanic soccer fans is a cornerstone element of Defendant's overall marketing strategy.  For example, an advertising industry trade publication recently addressed Defendant's goal of reaching out to Hispanic soccer fans in an article entitled "*Dewalt Launches Integrated Marketing Campaign to Connect with Hispanic Soccer Fans Nationwide*."  (Portada, Oct. 7, 2009, http://www.portada-online.com/html/website/paid/2009/100709/Dewalt-Soccer.aspx.)

33.    The theme of connecting with Hispanic soccer fans was echoed in a press release issued on behalf of DeWalt and a company known as Eurosport/Soccer.com, which trumpeted DeWalt's efforts to "connect with Hispanic soccer fans."  In this press release, Hector Vallejo, an employee of Defendant whose title is Hispanic Marketing Manager, states that Defendant is "execut[ing] a program designed specifically for Hispanic contractors, one of our most important end user segments."  The press release notes that "DEWALT is using Eurosport's unique position in the Hispanic marketplace to reach Hispanic soccer enthusiasts around the country."  The press release touts the idea "to help grow the DEWALT brand in the Hispanic community by building and executing relevant cultural events and contests," and identifies "[o]ne such event, El Tricolor Contest by DEWALT, [that] gives soccer fans the chance to win a signed adidas Mexico jersey." The release further states that, "[i]n conjunction with El Tricolor Contest, DEWALT is sponsoring local soccer leagues and tournaments in key Hispanic markets."  (DEWALT Partners with Eurosport to Launch New Compact Lithium Cordless Products, Oct. 6, 2009, http://www.hispanicprwire.com/News/in/15642/18/dewalt-partners-with-eurosport-to-launch-new-compact-lithium-cordless-products.)

34.    In a press release dated September 4, 2008, Defendant announced that it hired Fernando Fiore, the host of the popular Spanish-language sports television program Republica Deportiva, to promote DeWalt products at events such as a "Soccer League Event Promotion, in San Antonio, Texas."  (DEWALT PARTNERS WITH FERNANDO FIORE TO HOST DEWALT-SPONSORED EVENTS, Sep. 4, 2008, http://www.dewalt.com/us/articles/press_release.asp?Site=service&ID=1656.)

35.    Recently, a newspaper analyzed Defendant's current marketing strategy and reported that, "for one industrial tool manufacturer [*i.e.*, Defendant], soccer presented just the marketing link needed to advance its campaign."  The article reported that Hispanic customers are a significant market for Defendant, and, in that community, DeWalt understands there to be "the presence of a strong passion for soccer. With a growing population of Hispanics in the U.S. coupled with the increasing popularity of soccer, the connection seemed like a match made in heaven."  The report concluded that, "[i]f they [DeWalt] can somehow link their product and their message with a soccer flavor, they will attract a lot of Hispanics."  (Soccer, power tools companies team up, The Herald-Sun, Nov. 21, 2009, http://www.heraldsun.com/pages/full_story/push?article-Soccer-+power+tools+companies+team+up%20&id=4671835-Soccer-+power+tools+companies+team+up&instance=main_article.)

36.    Defendant apparently has concluded that there is no better way to link their product and message to soccer and the Hispanic community than by creating in the minds of consumers a false association and affiliation between DeWalt and the preeminent Hispanic soccer brands and events promoted by SUM, including MLS, the Mexican National Team, Chivas and the Gold Cup.

37.    B&D is also impairing the ability of Plaintiffs to reap the benefits of their investment in the marks of the properties represented by SUM (MLS, the FMF, Chivas, Gold Cup, USSF) (collectively the "SUM Marks"), as MLS and SUM can no longer guarantee that, by entering into a licensing agreement, these third parties would have the exclusive use of the SUM Marks.  Indeed, the confusion created by B&D's promotions is directly impacting SUM's relationship with Makita, which is the exclusive power tool sponsor of MLS and FMF since 2005.

38.    Without permission or authorization of any kind from Plaintiffs, in September 2007, Defendant took it upon itself to promote itself by free-riding on the September 27, 2007 soccer match between the MLS team D.C. United and Chivas to be played at RFK Stadium in Washington, D.C.  Without permission or authorization of any kind from Plaintiffs, Defendant distributed a flyer identifying *Plaintiffs'* property as "**FUTBOL con DEWALT**."  Defendant's flyer contained *Plaintiffs'* registered D.C. UNITED, D.C. UNITED & Design, MLS & Design trademarks and the CHIVAS, CHIVAS & Design and  the United States Soccer Federation logo design for which SUM is the exclusive licensee.  The flyer promised to readers: "Compra $1,500 de harramientas DEWALT para recibir 2 boletos **VIP**" (Buy $1,500 of DeWalt products to receive 2 VIP tickets).  Astoundingly, the flyer distributed by Defendant included a logo that identified the match between MLS's D.C. United and Chivas as the "COPA DEWALT 2007" or the "2007 DEWALT CUP."

39.    Reproduced below is a copy of the flyer distributed by Defendant, which, upon information and belief, was distributed at various Washington, D.C. area retailers:



40.     On or about May 8, 2008, Hector Vallejo, Defendant's "National Hispanic Marketing Manager," emailed SUM to attempt to order 310 tickets to an upcoming match promoted by SUM between the Mexican National Team and Argentina that would be played on June 4, 2008 at Qualcomm Stadium in San Diego, California. A representative of SUM wrote to Mr. Vallejo on or about that same day and indicated that "DeWALT does not have SUM or FMF approval to associate itself with this match or communicate any unauthorized relationships with our protected brands. Any violations are subject to legal action." Later that same day, Mr. Vallejo wrote back to the representative of SUM, responding: "Our company is not using or intends to associate ourselves with SUM or FMF. We were given this order form to order tickets to attend the game and not in anyway to associate ourselves with your corporation." Further, the

representative from SUM additionally spoke with Mr. Vallejo on the phone that same day to reiterate what was stated in the previous e-mails.  Mr. Vallejo again verbally assured the SUM representative that Defendant had no intention of using the tickets to associate itself with the match.

41.     Sometime before the June 4, 2008 match between the Mexican National Team and Argentina, a person acting on behalf of Defendant applied to Qualcomm Stadium for a permit to "host a soccer party for about 200 friends" in the parking lot of Qualcomm Stadium immediately prior to the June 4 match.  The person informed the stadium that it would be a private event and did not mention Defendant's involvement at anytime during the application process.  In applying for this permit, Defendant concealed that the real purpose for the permit was not to hold a party for friends, but—contrary to the representations of Mr. Vallejo—to associate Defendant with the Mexican National Team and the match promoted by SUM by setting up an area to market DeWalt tools.  Defendant in fact set up multiple DeWalt tents in section K1 of the Qualcomm Stadium parking lot, which is adjacent to the stadium and located in a high-traffic pedestrian area connecting the public transportation drop-off point to the stadium entrance, supplied with DeWalt tools and staffed with personnel to demonstrate the tools and, upon information and belief, to make sales.  Defendant prominently displayed the DeWalt name and demonstrated and, upon information and belief, sold DeWalt tools from the DeWalt display area in the Qualcomm Stadium parking lot.  Defendant intended to link itself to the match being played and cause persons attending the game to believe that there was some sponsoring relationship, affiliation or other connection between Defendant and its products and the Mexican National Team and Plaintiffs' property and goodwill.  Immediately upon learning of Defendant's

activities, both stadium and SUM representatives informed local police which assisted in Defendant's removal from the parking lot.

42.     Similarly, Defendant tried to link itself and its brand to the September 24, 2008 match staged at the Los Angeles Coliseum by SUM between the Mexican National Team and Chile.  In advance of that match, an individual using a Black & Decker corporate credit card purchased hundreds of tickets to the match over multiple visits to the box office at the Los Angeles Coliseum.  When questioned by the stadium box office staff about why he needed so many tickets, the purchaser gave assurances that the tickets were so that B&D employees could attend the game.  These assurances were false.

43.     Rather than for employees to attend the game, Defendant intended to use the tickets for the purposes of promoting itself and its brand, and to create a false association between itself and Plaintiffs' properties in the mind of consumers.  Reproduced below is a copy of an advertisement linking Defendant to the match distributed in the Los Angeles area by Defendant:



This advertisement promises free tickets to the Mexican National Team's game against Chile to customers that purchase $600 in DeWalt tools and accessories.

44.    On September 24, 2008, the day of the match between the Mexican National Team and Chile, Defendant descended upon the Los Angeles Coliseum with its ambush marketing team, complete with huge signage displaying the DeWalt brand, its usual tent displays of DeWalt products, its contingent of product demonstrators and sales personnel, and its give

away of tickets to the game. Defendant set up in close proximity to the match, just across the street from the grounds of the Los Angeles Coliseum.

Reproduced below are photographs showing a portion of Defendant's marketing presence for the September 24, 2008, game:





45.     Defendant also tried to link itself and its brand to a match played by the Mexican National Team in the CONCACAF Gold Cup tournament.  The match, between the Mexican National Team and Panama was held on July 9, 2009 at Reliant Stadium in Houston, Texas. Prior to the game, Defendant inquired about securing a sponsorship of the match directly with Reliant Stadium officials, which informed them that all sponsorships must be secured directly through SUM.  Defendant then informed Reliant Stadium officials that they wished to only purchase hundreds of tickets directly from the Reliant Stadium ticket office as part of an employee appreciation event.  As such, the Reliant Stadium box office sold approximately 200 tickets to Defendant, which Defendant then utilized to promote its brand and create a false association between itself and the match by providing the tickets to fans at no cost in exchange for their purchase of DeWalt products.

46.     Reproduced below is a copy of an advertisement linking Defendant to the match between the Mexican National Team and Panama that was distributed in the Houston area by Defendant:



This advertisement promises free tickets to the Mexican National Team's game against Panama to customers that purchase $500 in DeWalt tools and accessories.

47.     Upon SUM becoming aware of the above Houston area promotion by Defendant (which included its misuse of tickets), SUM immediately contacted Defendant via Reliant Stadium officials. Specifically, Reliant Stadium officials spoke with Jaime Martinez, an

employee of Defendant located in the Houston area, and informed him that such promotion and use of the tickets was illegal and must immediately cease. In addition, as a follow-up to this phone conversation, Reliant Stadium officials emailed the following to Mr. Martinez on June 18, 2008: "As we discussed today on the phone, DeWalt does not have any sponsorship rights related to the 2009 CONCACAF Gold Cup or the Mexican National Team. To be clear, this means DeWalt must immediately discontinue any promotions in connection with the match and/or team, including removing any existing promotional material from the marketplace. Therefore, the 200 tickets you purchased for the match should not be used as part of any in-store giveaway, nor should you invite the public to visit any branded tents in the stadium parking lots prior to or during the event." Despite these efforts, Defendant continued its illegal activity leading up to the game.

48.     On July 9, 2009, the date of the game between the Mexican National Team and Panama, representatives of Defendant showed up several hours before the game at Reliant Stadium, the site of the game, with a tractor-trailer truck filled with DeWalt products to demonstrate and sell, and a team to construct an on-site presence for Defendant.

49.     Defendant's representatives repeatedly were asked not to set up and to leave the premises of Reliant Stadium by officials of the stadium. Defendant's representatives agreed to leave the stadium parking lot.

50.     However, a few hours later Defendant showed up again, this time with several bright yellow DeWalt branded vehicles that were driven by people wearing bright yellow DeWalt branded shirts. Again, Reliant Stadium officials informed Defendant that they were not permitted on the property. After several discussions, Defendant representatives relented again and agreed to leave.

51.    Reproduced below are photographs showing some of the several DeWalt vehicles that showed up attempting to preserve an area in the parking lot of Reliant Stadium at which to set up Defendant's marketing presence for the July 9, 2009 game:





52.     In addition to attempting to associate itself with Plaintiffs' properties and goodwill by conducting ambush marketing at the sites of Plaintiffs' events, Defendant has employed other means to link itself to Plaintiffs' marks and goodwill.  For example, Defendant currently is running a promotion using trademarks and trade dress belonging to Plaintiffs in connection with a sweepstakes sponsored by Defendant.  Specifically, Defendant ran a promotion entitled, alternatively in Spanish and English, "EL CONCURSO EL TRICOLOR" or "EL TRICOLOR CONTEST," in which the advertised prize is a shirt that is part of the team uniform for the Mexican National Team.

53.     Defendant named its promotion using the designation used to identify the Mexican National Team—EL TRICOLOR.  In addition, Defendant's advertisements for its promotion displays the team's uniform including the trademark logo.  Reproduced below is a copy of a screen-capture depicting a promotion for the contest appearing on Defendant's web site:



54.     Upon information and belief, Defendant's acts of unauthorized use of Plaintiffs' trademarks and other property and other ambush marketing tactics identified in paragraphs 38 through 53 above are just a sample of the massive ongoing false and deceptive pattern and practice engaged in by Defendant to confuse the public and free ride on, infringe the rights of, compete unfairly with and otherwise harm Plaintiffs.

55.     Plaintiffs have repeatedly written to Defendant demanding that it cease and desist from its unlawful conduct.  Following each of Plaintiffs' demands that Defendant halt its unauthorized use of their marks and refrain from other unlawful activity, Defendant knowingly, blatantly and willfully continued to engage in its unlawful practices of reaching out to the Hispanic community by deceptively conveying an association, affiliation or sponsorship between itself and the soccer teams and matches affiliated with Plaintiffs.

56.     All the while that it associated itself with teams and events promoted by Plaintiffs, Defendant knowingly or negligently engaged in acts intended to and which did confuse the public into believing that Defendant acquired the right to utilize Plaintiffs marks as well as to promote and give away tickets to games played in by MLS teams, the Mexican National Team, Chivas, and as part of the CONCACAF Gold Cup tournament, and to distribute its own products and game tickets on site.

57.     Defendant has endeavored to create in the public mind, and has succeeded to Plaintiffs' continuing harm—and to the continuing harm of Plaintiffs' actual licensees specifically including their licensee for the category of power tools—a mistaken belief that there is an affiliation, association, sponsorship, or other connection between Plaintiffs and Defendant.

58.     Upon information and belief, Defendant intends, unless enjoined by this Court, to continue its course of conduct and to wrongfully use, infringe upon, and otherwise profit from Plaintiffs' trademarks; to compete unfairly; to falsely advertise; and to confuse and deceive consumers.

59.     As a direct and proximate result of the acts of Defendant, Plaintiffs already have suffered irreparable harm and has sustained losses of revenue and good will.  Plaintiffs have no adequate remedy at law to redress all of the injuries that Defendant has caused, and intends to cause by its conduct.  Plaintiffs will continue to suffer irreparable damage and sustain lost revenue until Defendant's actions as described above are enjoined by this Court.

## COUNT I
## FEDERAL TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1125(a)

60.     Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 59 above as if fully set forth herein.

61.    Plaintiffs utilize each of the trademarks identified above in interstate commerce and have done so exclusively and continuously for many years, in some instances since at least as early as 1996.

62.    Defendant has, without consent from Plaintiffs, used Plaintiffs' marks in connection with Defendant's own goods and services and its marketing and promotion thereof, in manners which have caused actual confusion and which are likely to continue to cause confusion and mistake and to deceive consumers as to the source or origin of Defendant's goods and services.

63.    By its actions alleged above, Defendant has damaged Plaintiffs and the business and goodwill symbolized by their marks.

64.    By its actions alleged above, Defendant has infringed and will continue to infringe Plaintiffs' marks in violation of Section 43 of the Lanham Act.

65.    The actions of Defendant constitute willful trademark infringement.

66.    As a direct and proximate result of its wrongful conduct, Defendant has realized profits and other benefits to which Defendant is not entitled.

67.    As a direct and proximate result of Defendant's wrongful conduct, Defendant has caused and is causing substantial and irreparable harm to Plaintiffs, their marks and to the business and goodwill represented by their marks, in an amount not readily capable of determination.  Unless restrained by this Court, Defendant will cause further irreparable harm to Plaintiffs.

68.    The acts of the Defendant infringe MLS's SUM Marks, with consequent damage to Plaintiff as the exclusive agent in the United States of the SUM Marks and the business and

goodwill symbolized by those federally-registered trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. §1114.

69.    Defendant's acts of trademark infringement have caused great and irreparable injury to Plaintiff, MLS, to the SUM Marks, and to the business and goodwill represented by the SUM Marks, in an amount that cannot be ascertained at this time.

70.    By reason of the foregoing, Plaintiffs are entitled to injunctive relief against the Defendant, and, after trial recover any damages proven to have been caused by reason of Defendant's acts of trademark infringement.

## COUNT II
## TRADEMARK INFRINGEMENT UNDER 15 U.S.C. §§ 1114, 1117

71.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 though 70 above as if fully set forth herein.

72.    MLS is the owner, and SUM the exclusive licensee, of trademark registrations on the Principal Register of the United States for the marks identified in Paragraph 10.  In addition, SUM is the exclusive licensee for U.S. Registration Nos. 3,119,262 and 2,829,197 owned by FMF for the FEDERACION MEXICANA DE FUTBOL ASOC., A.C. & Design marks.

73.    Defendant has, without consent from Plaintiffs, used the registered marks in connection with Defendant's own goods and services and its marketing and promotion thereof, in manners which have caused actual confusion and which are likely to continue to cause confusion and mistake and to deceive consumers as to the source or origin of Defendant's goods and services.

74.    By its actions alleged above, Defendant has damaged Plaintiffs and the business and goodwill symbolized by their registered marks.

75.     By its actions alleged above, Defendant has infringed and will continue to infringe the Plaintiffs' marks in violation of Section 32 of the Lanham Act.

76.     The actions of Defendant constitute willful trademark infringement.

77.     As a direct and proximate result of its wrongful conduct, Defendant has realized profits and other benefits to which Defendant is not entitled.

78.     As a direct and proximate result of Defendant's wrongful conduct, Defendant has caused and is causing substantial and irreparable harm to Plaintiffs, their registered marks and to the business and goodwill represented by their registered marks, in an amount not readily capable of determination.  Unless restrained by this Court, Defendant will cause further irreparable harm to Plaintiffs.

79.     By reason of the foregoing, Plaintiffs are entitled to injunctive relief against the Defendant, and, after trial, to recover any damages proven to have been caused by reason of Defendant's willful acts of trademark infringement.

## COUNT III
## FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. §1125(a)

80.     Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 79 as if fully set forth herein.

81.     Defendant's use of Plaintiffs' marks and other conduct attempting to associate itself with the goods and services of Plaintiffs, including Defendant's statement that soccer matches staged by Plaintiffs are part of the DeWalt Cup, is likely to cause consumers to mistakenly believe that the Defendant has an affiliation with the Plaintiffs, or that Defendant's goods are sponsored or approved by Plaintiffs, or that the Defendant is otherwise associated with or has obtained permission from Plaintiffs.

82.    Defendant's acts of unfair competition and false designation of origin have caused irreparable injury to Plaintiffs, their goodwill and their reputation in an amount that cannot be ascertained at this time and, unless enjoined, will cause further irreparable injury, leaving Plaintiffs with no adequate remedy at law.

83.    By reason of the foregoing, Plaintiff is entitled to injunctive relief against the Defendant, and, after trial, to recover any damages proven to have been caused by Defendant's acts of false designation of origin.

### COUNT IV
### FALSE ADVERTISING UNDER 15 U.S.C. §1125(a)

84.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 83 as if fully set forth herein.

85.    Defendant's advertising and promotion of its products falsely states that a soccer match between D.C. United and Chivas is part of the "DeWalt Cup" or "Copa DeWalt" and contains numerous other misrepresentations likely to deceive consumers into mistakenly believing that Defendant  has an affiliation with the Plaintiffs, or that Defendant's goods are sponsored or approved by Plaintiffs, or that the Defendant is authorized to distribute tickets to matches promoted by Plaintiffs or otherwise associated with or has obtained permission from Plaintiffs.

86.    Plaintiffs have been irreparably harmed and will continue to be irreparably harmed unless Defendant is enjoined from misrepresenting attributes of its and Plaintiffs' services.  In addition, consumers have been harmed, and will continue to be harmed, by Defendant's deceptively advertising that it possesses affiliation or connection with Plaintiffs and their properties when in fact it does not.

87.     Defendant's material false representations of fact in its advertising and promotional materials misrepresent the inherent nature, characteristics and qualities of Defendant's goods and services.

88.     By reason of the foregoing, Plaintiffs are entitled to injunctive relief enjoining further false advertising by Defendant, and to recover such monetary damages that have been caused by Defendant's acts of false advertising.

## COUNT V
## BREACH OF CONTRACT

89.     Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 88 as if fully set forth herein.

90.     All tickets to MLS games and to the games promoted by SUM, including the games involving the Mexican National Team, Chivas, MLS teams (e.g., D.C. United) or the CONCACAF Gold Cup tournament, contain contractual language specifying how the tickets may and may not be used.  Among other provisions, the contractual language on these tickets specifies that: "Commercial use of ticket prohibited without written approval."

91.     At all times relevant to the matters alleged in the herein, Defendant had full knowledge of the terms set forth on the tickets.  Moreover, on or about May 8, 2008, Plaintiffs wrote to Defendant and advised Defendant of the presence of the terms on every ticket, and provided a copy of those terms to Defendant.  By repeatedly purchasing and using the tickets with full knowledge of the applicable contractual terms, Defendant agreed to be bound by those terms.  Defendant further manifested an intent to be bound by the applicable terms when representatives of Defendant indicated when obtaining the tickets at the box office that the tickets would not be used in violation of the prohibition against commercial use set forth in the terms.

92.     Plaintiffs at all times performed all of their obligations under the agreement embodied in the tickets.

93.     Defendant used the tickets in violation of the provision prohibiting their use for commercial purposes.  Among other things, Defendant used the tickets for the commercial purpose of marketing and promoting Defendant's goods and services and as premiums given away to customers who spent certain milestone amounts buying Defendant's products.

94.     The acts of Defendant described above violate and breach its contract with Plaintiff.

95.     As a direct and proximate result of Defendant's violations and breaches of its agreements with Plaintiffs, Plaintiffs have been substantially harmed in an amount not readily capable of determination.

## COUNT VI
## FRAUD

96.     Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 95 as if fully set forth herein.

97.     Plaintiffs had no obligation to sell tickets for any MLS, Mexican National Team or Chivas game, or for any game part of the CONCACAF Gold Cup tournament, to Defendant.

98.     Defendant understood that if it truthfully informed Plaintiffs that Defendant intended to purchase tickets to Plaintiffs' soccer matches so that Defendant could use those tickets for the commercial purposes for which Defendant ultimately used the tickets, Plaintiffs would not have made any tickets available to Defendant.

99.     Thus, with complete knowledge that Defendant wanted hundreds of tickets to each match in order to make commercial use of the tickets—specifically, to create a commercial association between Plaintiffs' soccer matches and Defendant's products in the mind of the

Hispanic consumers who were targeted as a key market segment by Defendant—Hector Vallejo, Defendant's National Hispanic Marketing Manager, falsely stated in writing to Plaintiffs that "Our company is not using or intends to associate ourselves with SUM or FMF. We were given this order form to order tickets to attend the game and not in anyway to associate ourselves with your corporation." Despite this communication, Defendant proceeded to obtain tickets directly from the box office and stated that tickets Defendant desired to purchase would be used so that employees could attend a game and would not be used for commercial purposes. Other representatives of Defendant similarly communicated to Plaintiffs and/or box office personnel that Defendant sought tickets only so that Defendant's employees could attend a game but not for commercial use.

100.    Defendant knew that the statements it made were false when uttered, and Defendant intended that Plaintiffs rely on those statements so that Defendant could obtain sufficient tickets to serve Defendant's intended commercial purposes.

101.    Plaintiffs reasonably and justifiably relied to their detriment on the statements made to them by Defendant's National Hispanic Marketing Manager and other representatives.

102.    Defendant has used the tickets it fraudulently obtained to Plaintiffs' harm, including harm to the goodwill and reputation of Plaintiffs generally and damage to Plaintiffs' reputation with their actual official power tool licensee.

103.    As a direct and proximate result of Defendant's fraudulent actions, Plaintiff has been substantially harmed in an amount not readily capable of determination.

## COUNT VII
## TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION
## UNDER STATE LAW

104.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 103 as if fully set forth herein.

105.    The acts of the Defendant as described above constitute trademark infringement and unfair competition in violation of Plaintiffs' rights under the common and statutory law of the States of California, Texas and such other States within which Defendant has conducted its ambush marketing directed at Plaintiffs' events.

## COUNT VIII
## DECEPTIVE ACTS AND PRACTICES

106.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 105 as if fully set forth herein.

107.    The acts of the Defendant as described above constitute deceptive acts and practices in violation of the common and statutory law of the States of California, Texas and such other States within which Defendant has conducted its ambush marketing directed at Plaintiffs' events..

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in its favor as follows:

A.    Declare that Defendant's unauthorized conduct violates Plaintiffs' rights under the Lanham Act, the common law of New York, and the New York General Business Law;

B.    Immediately and permanently enjoin the Defendant, its officers, directors, agents, servants, employees, representatives, attorneys, related companies, successors, assigns, and all others in active concert or participation with them from:

(1)    Using the Plaintiffs' marks or any confusingly similar designation;

(2)    From doing any other acts or things calculated or likely to cause confusion or mistake in the mind of the public or to lead consumers into the belief that products or services sold, offered for sale, or distributed by the Defendant are authorized, sponsored, licensed, endorsed, promoted or condoned by Plaintiffs or, or that Defendant is otherwise affiliated with or connected to Plaintiffs;

(3)    Otherwise competing unfairly with Plaintiff in any manner;

(5)    Aiding any other party in doing any acts prohibited by this paragraph.

C.    Order that the Defendant, pursuant to 15 U.S.C. §1116, serve on Plaintiffs within thirty (30) days after service on Defendant of the requested mandatory, permanent, or preliminary injunction orders, a report in writing under oath setting forth in detail the manner and form in which the Defendant has complied with the injunction(s);

D.    Order that Defendant account to Plaintiffs for Defendant's profits and any damages sustained by Plaintiffs arising from Defendant's acts of trademark infringement, false designation of origin, false advertising and unfair competition, and that Plaintiffs be awarded the greater of (i) three times Defendant's profits, or (ii) three times any damages sustained by Plaintiffs, under 15 U.S.C. § 1117, plus prejudgment interest;

E.    Order the Defendant to pay Plaintiffs enhanced damages for its oppression, fraud, malice, and gross negligence, whether grounded on proof of actual damages incurred by Plaintiffs or on proof of Defendant's unjust enrichment;

F.    Award Plaintiffs their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees and investigative expenses, on the ground that this is an exceptional case under 15 U.S.C. §1117; and

G.    Award Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
       December 22, 2009

                              LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.


                              By: _____
                                  Robert Penchina
                                  Laura M. Leitner
                                  321 West 44th Street, Suite 510
                                  New York, NY 10036
                                  Tel:  (212) 850-6109
                                  Fax:  (212) 850-6299

                              *Attorneys for Plaintiffs Soccer United Marketing, LLC and Major League Soccer, L.L.C.*